Joseph D. SHOEMAKER, Appellant,

v.

Edward J. DERWINSKI, Secretary
of Veterans Affairs, Appellee.

No. 90–1055.

United States Court of Veterans Appeals.

Argued Dec. 5, 1991.

Decided Sept. 21, 1992.

Michael J. Gaffney, Washington, D.C., for appellant.

Michael P. Butler, with whom Robert E. Coy, Acting Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, and Pamela L. Wood, Deputy Asst. Gen. Counsel, Washington, D.C., were on the brief, for appellee.

Before KRAMER, FARLEY and STEINBERG, Associate Judges.

STEINBERG, Associate Judge:

The appellant, veteran Joseph D. Shoemaker, challenges a May 30, 1990, Board of Veterans' Appeals (BVA or Board) decision which awarded him an increase from 30% to 50% in his service-connected disability rating for a "psychophysiological gastrointestinal reaction with probable ulcer". *Joseph D. Shoemaker*, BVA 90–17136 (May 30, 1990). He argues on appeal that in assessing his claim for an increase in his disability rating, the Board should have awarded him a 100% disability rating. The Court holds that, under 38 U.S.C. § 7104(d)(1) (formerly § 4004), the Board erred by failing to provide the reasons or bases for its findings and conclusions, by failing to address, if not to consider, pertinent regulations governing findings of individual unemployability, and by failing to order a thorough and fully informed medical examination to determine, inter alia, the level of the veteran's disability and the contribution to his service-connected disability of each of his psychiatric impairments. Consequently, the record will be remanded for readjudication in accordance with this opinion.

## I. BACKGROUND

The veteran served on active duty in the United States Navy from January 1955 to July 1958 and in the Air Force from December 1958 to February 1960. R. at 3, 171. Prior to the initiation of these pro-

ceedings, and effective on December 20, 1974, the Veterans' Administration (now Department of Veterans Affairs) (VA) awarded the veteran a 30% service-connected disability rating for psychophysiological gastrointestinal reaction with a probable ulcer. R. at 139, 171. On October 20, 1987, he submitted to the VA a claim for an increased rating. His claim was denied twice by the VA Regional Office (RO) before reaching the Board. During a hearing before the BVA, the veteran testified under oath that on May 15, 1984, he had been fired from his civilian job as a barber on a military installation, where he had worked since 1975, and that he had not worked since that time. R. at 179. In September 1984 the veteran apparently was hospitalized for depression in the psychiatric unit of the Tucson, Arizona, VA Medical Center (VAMC). R. at 113 (these records do not appear in the record on appeal). In December of that year, the veteran apparently was examined at the VAMC by Dr. Comer, a neuropsychologist, to whom he had complained of memory problems and "blanking out when he was away from home". R. at 113. The neuropsychologist's testing indicated that the veteran's "psychological adjustment was characterized by depression, anxiety and somatization." *Ibid.* His "blanking out" was believed to be a manifestation of emotional distress. In 1985, further psychological testing at the VAMC, conducted by Dr. Johnson, demonstrated that the veteran suffered from "considerably more emotional disturbance than when he was tested in 1984." R. at 113.

On April 25, 1987, the veteran's treating VA psychiatrist, Dr. Zuniga, completed a "Mental Residual Functional Capacity Assessment" to facilitate review of the veteran's application to receive Social Security disability benefits. R. at 29. The psychiatrist categorized the veteran as "markedly limited", the most limiting category on the scale provided on the evaluation form, in his ability to, inter alia, (1) maintain concentration for extended periods, (2) perform activities within a specified schedule, (3) work in coordination with or proximity to others, (4) make simple work-related decisions, (5) complete a normal workday or

week without interruption from psychological symptoms, (6) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (7) respond appropriately to changes in the work setting. *Ibid.* He further stated:

[The veteran] has shown evidence of social-vocational dysfunction related to abnormal affect for many years. He is not able to handle co-workers[,] supervisors[,] clients[, or] human relations without severe tension[,] irritability[,] and depression.

R. at 31. Dr. Zuniga indicated on the evaluation form the categories of disorders upon which his opinion was based, including anxiety disorders, anxiety-related disorders, and personality disorders. R. at 32. However, he noted that anxiety was the "predominant disturbance" or was "experienced in the attempt to master [other] symptoms". R. at 35. The psychiatrist noted that the veteran's anxiety-related disorder resulted in "*complete* inability to function independently outside the area of one's home." R. at 38 (emphasis in original).

On May 1, 1987, Dr. Heiman, a private psychiatrist, at the behest of the veteran's attorney, conducted a psychiatric evaluation of the veteran and reviewed, inter alia, letters from the veteran's therapist at the Cochise Community Counseling Services (CCCS), medical records from the VAMC, and Social Security records. R. at 112. On mental status examination, the veteran's affect "was blunted, his tone was monotonous, and he cried frequently during the interview." *Ibid.* When asked "some formal mental status questions ... he began to weep and shake and stated that he could not answer because he was afraid to make mistakes." R. at 115. Dr. Heiman concluded, in pertinent part:

My diagnosis is major depression in a person with mixed personality disorder. Mr. Shoemaker's symptoms are quite overwhelming as corroborated by the psychological testing.

*Ibid.* Dr. Heiman also completed Social Security disability evaluation forms, noting attributes similar to and consistent with

those noted by Dr. Zuniga, and added a notation under the form's personality disorders category that the veteran had "[i]nflexible and maladaptive personality traits". R. at 121.

In a May 21, 1987, letter to Dr. Zuniga, the veteran's therapist, Ann Anderson, a behavioral health counselor at CCCS, stated:

During the past year, Mr. Shoemaker has attempted to work and take care of his business affairs, in an effort to help his wife who works long hours daily. This resulted in frustration for him as he is emotionally unstable and unable to withstand any stress or situation that calls for control very long.

R. at 107.

On June 12, 1987, an administrative law judge (ALJ) awarded the veteran Social Security disability benefits, effective from May 15, 1984, the date he was fired from his job. R. at 103. The ALJ concluded, inter alia, that the veteran's psychiatric impairments—dysthymic disorder, anxiety disorder, and mixed personality disorder—had prevented him from working for at least twelve continuous months. *Ibid.*

In early February 1988, Dr. Zuniga examined the veteran in an outpatient visit and concluded that he manifested "fragile but satisfactory control of anxious depression". R. at 13. On February 24, 1988, the veteran received a VA medical examination for the purpose of evaluating his service-connected disability. R. at 130. The examining physician who evaluated the veteran's physical condition stated explicitly that the veteran's VA claims file and medical records were not available to review in preparation for the examination. R. at 132. The physical examination showed only peptic inflammation. There was no evidence of ulceration. R. at 134. The neuropsychiatric examination showed that the veteran interacted in a depressed, submissive, and downtrodden way. R. at 133. He spoke softly, providing very brief responses to questions. He manifested "considerable psychomotor retardation", and his thought content evidenced "hopelessness". R. at 133. The physician's assessment was "psy-chophysiologic gastrointestinal reaction, major depression and personality disorder not otherwise specified." R. at 133.

By May of 1989, the RO had twice denied the veteran's claims for an increased rating. R. at 139, 146. In a June 6, 1989, letter to VA, Ms. Anderson, who had treated the veteran since 1984, stated that the veteran's emotions were "volatile as he begins to cry and shake when upset". R. at 154. She noted that he was unable to maintain relationships with co-workers or others and that he could not "stand or sit for any period of time as he [was] very nervous." R. at 155. She concluded: "This person is mentally and physically disabled." *Ibid.* In an undated letter, apparently submitted at an April 1990 BVA hearing, Ms. Anderson similarly stated:

His emotional instability results in agitating and aggravating all of his physical ailments.... Interacting with others is difficult also as he is explosive and defensive[,] many times crying out of frustration or utilizing hostility to hide hurt. All these characteristics point out ... that [he] is not employable.

R. at 202.

Echoing the above concerns, one of the veteran's former spouses stated in a June 6, 1989, letter that she could no longer tolerate his "violent temper" and "sudden outburst[s] of anger and frustration". R. at 156. The letter recounts examples of provocative behavior, such as the veteran's pushing his fist through the windshield of his car, breaking off the cruise control mechanism of the car, threatening suicide, and putting his head through a shower door. R. at 157–58.

In March 1990, Ms. Anderson affirmed the ongoing nature of her previous observations, stating in a letter to VA, in pertinent part:

He is **still** emotionally unstable and has severe bouts of nervousness and shakiness. He is unable to withstand any unusual stress, becoming very frustrated, with bouts of crying, and is generally not able to cope with everyday living in a controlled manner for any length of time.... He is not employable[;] fur-

thermore, the origin of **all** his illness have [sic] a military etiology. His condition [warrants a] 100% disability status.

R. at 204 (emphasis added).

On April 24, 1990, the veteran received a hearing before the BVA, during which he testified under oath that he was then receiving Social Security disability benefits (R. at 172); that he had not worked since May 1984 when he was fired (R. at 179); and that he had sought vocational rehabilitation services through VA and had been told that "it was not feasible [for him] to be retrained in any type of area that would possibly put [him] back to work" because "the psychiatrist" had concluded that the veteran was too emotionally unstable (R. at 183–84).

A witness, who had known the veteran for at least eight months prior to the BVA hearing and had lived in the same household for a number of weeks prior to the hearing (R. at 189), stated, under oath, that if he were a business owner he would not hire the veteran because of his inability to handle any experience that was "out of the norm"; his "emotional responses are inappropriate". R. at 193. According to this witness, when any person aside from a family member came to the home, when the veteran ventured outside the home, or when any stressors were introduced into his environment, he could not adapt. R. at 190.

On May 30, 1990, the BVA awarded the veteran an increase from 30% to 50% in his service-connected disability rating for his psychophysiologic condition. In discussing its decision, the Board stated that it was "of the opinion" that the veteran's service-connected disability was "more disabling" than was reflected in the 30% disability rating. *Shoemaker,* BVA 90–17136, at 4. It further stated that the "clinical evidence" and "the veteran's personal testimony" indicated "considerable impairment" and, hence, awarded him a 50% disability rating. A proper appeal to this Court followed. 38 U.S.C. §§ 7252(a), 7266 (formerly §§ 4052, 4066).

## II. ANALYSIS

### A. Reasons or Bases and Benefit of the Doubt

 Under 38 U.S.C. § 7104(d)(1) (formerly § 4004) and *Gilbert v. Derwinski,* 1 Vet.App. 49, 56–57 (1990), the BVA is required to provide in its decisions a statement of the reasons or bases for its findings and conclusions with respect to all material issues of fact and law presented on the record. Only if provided with "complete [albeit succinct] explanations" for a BVA panel's actions may the Court effectively review the decision and may the appellant understand and evaluate the Board's actions. *Gilbert, supra; see Douglas v. Derwinski,* 2 Vet.App. 103, 108 (1992) (even if Board considered all evidence and rejected it, Board was required to state precise basis for decision and respond to various arguments of appellant); *Peyton v. Derwinski,* 1 Vet.App. 282, 285–86 (1991) (among reasons or bases for decision, Board must include precise basis, response to appellant's arguments, and analysis of credibility or probative value of evidence); *Hatlestad v. Derwinski,* 1 Vet. App. 164, 169–170 (1991) (*Hatlestad I*) (Board's discussion failed to include explanation as to veteran's unemployability and failed to make express credibility determination regarding veteran's testimony); *Ohland v. Derwinski,* 1 Vet.App. 147, 149 (1991) (Board's decision provided inadequate reasons or bases since it failed to analyze credibility or probative value of evidence, to provide any explanation for decision that claimant was not unemployable, to analyze lay evidence, and to address examining physician's opinion). The BVA decision which is the subject of this appeal presents a veritable textbook example of noncompliance with these requirements, thereby precluding effective judicial review and understanding of the Board's decision not to award the veteran more than a 50% disability rating.

In order to receive, pursuant to 38 C.F.R. § 4.132, Diagnostic Code (DC) 9411 (1991), a 30% rating for a psychoneurotic disability, one must demonstrate **"[d]efinite** impairment in the ability to establish or main-

tain effective and wholesome relationships with people"—social impairment—and reduced initiative, flexibility, efficiency, and reliability to the extent that "definite industrial impairment" results. (Emphasis added.) A 50% disability rating under DC 9411 is assigned when a claimant has demonstrated **considerable** social impairment and his or her reliability, flexibility, and efficiency are so reduced as to result in **considerable** industrial impairment as well.

A 70% rating under DC 9411 will be assigned to a claimant who exhibits **severe** social impairment and whose psychoneurotic symptoms, generally, are so **severe** and persistent as to result in severe impairment in the ability to obtain or retain employment. To receive a 100% disability rating for this condition, not only must a claimant demonstrate the inability to obtain or retain employment, but he or she must also be so adversely affected by all but the most intimate contacts that **virtual isolation** results, and the claimant must exhibit **totally incapacitating** psychoneurotic symptoms bordering on gross repudiation of reality, through, for example, disturbed thought or behavioral processes such as fantasy, confusion, panic, and explosions of aggression associated with most daily activities. 38 C.F.R. § 4.132, DC 9411.

■ The Court is confronted with a BVA decision which provides no explanation as to how the Board arrived at its conclusion that an increase to no more than 50% in the veteran's disability rating was warranted. The Board is required to explain, in the context of the facts presented, the rating criteria used in determining the category into which the veteran's symptoms fall. *See Ohland v. Derwinski,* 1 Vet.App. 147, 150 (1991); *see also Webster v. Derwinski,* 1 Vet.App. 155, 159 (1991). Accordingly, the Board had an obligation here, where the veteran specifically had requested an increase in his then 30% rating, to explain why the veteran's symptoms comported with the criteria of the 50% disability rating but not with the criteria of the 70% or 100% disability ratings. *See* 38 C.F.R. § 4.7 (1991) (where question exists as to which of two evaluations is appropriate, higher evaluation will be assigned if its criteria are more nearly approximated).

■ The Board also should have addressed the " 'probative value of the evidence submitted by or on behalf of the veteran' ", especially since its conclusion that the veteran suffered only "considerable" impairment seems inconsistent with the conclusions drawn in several of the medical reports of record. *Hatlestad I,* at 169 (quoting *Gilbert,* 1 Vet.App. at 59); *Webster, supra; Ohland, supra.* For example, the Social Security Administration (SSA) ALJ had concluded in 1987 that the veteran was entitled to receive Social Security disability benefits because, inter alia, "the severity of [his] psychiatric impairments [had] **precluded** him from working for at least [twelve] continuous months". R. at 103 (emphasis added). Related to this determination and also included in the record here are the medical evaluations prepared for the SSA in which Dr. Zuniga had stated in 1987 that the veteran was "markedly limited" in several work-related functions, that he could not handle co-workers, supervisors, clients, or human relations generally, without severe tension, irritability, and depression, and that his psychiatric symptoms resulted in the *"complete* inability to function independently outside" his home. R. at 38 (emphasis in original). Dr. Heiman echoed these concerns on similar forms and also stated that the veteran's symptoms were "quite overwhelming". The veteran's counselor at CCCS since 1984 had stated in March 1990 that the veteran continued to be emotionally unstable, unable to cope for any length of time with daily life, and was, therefore, "100% disab[led]". The Board was required to explain why, in the context of the full history of the veteran's treatment and condition (*see* 38 C.F.R. §§ 4.1, 4.10 (1991)), statements such as these throughout the record did not lead to a conclusion to increase the veteran's disability rating beyond 50%.

■ Certainly, the Board should have addressed the SSA's finding that the veteran's psychiatric impairments precluded him from working. The record includes the ALJ's decision as well as the evaluation

forms on which it was based, and the Board had been apprised of the veteran's receipt of Social Security benefits by the veteran at his hearing. In *Collier v. Derwinski*, 1 Vet.App. 413, 417 (1991), the Court held that the decision of an ALJ regarding a Social Security disability claim "cannot be ignored and to the extent its conclusions are not accepted, reasons or bases should be given therefor." *See Brown (Clem) v. Derwinski*, 2 Vet.App. 444, 448 (1992); *Murincsak v. Derwinski*, 2 Vet.App. 363, 370–372 (1992) (determination by SSA that a claimant is entitled to disability benefits is relevant to VA determination of severity of veteran claimant's disability and is not stale for purposes of making that determination since SSA continuously reviews eligibility for disability benefits).

The Board not only failed to account for its rejection of higher ratings and its implicit rejection of evidence in which it was stated that the veteran cannot handle human relations and is not employable, but it also failed to cite to independent medical authority or to quote from recognized medical treatises to substantiate its conclusion, thereby precluding meaningful review. *See Hatlestad v. Derwinski*, 3 Vet.App. 213, 217 (1992) (*Hatlestad II*). In *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991), and its progeny, the Court has held that such unsubstantiated medical conclusions cannot withstand scrutiny. "BVA panels may consider only independent medical evidence to support their findings" and must discuss the evidence they have relied upon in arriving at their findings and conclusions. *Colvin, supra; see Gilbert*, 1 Vet. App. at 57 (legislative history makes clear that conclusory statements do not satisfy "reasons or bases" requirement); *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990) (BVA decisions must include reasons or bases for medical conclusions; specificity required of BVA's reasons or bases depends on nature of claim).

Furthermore, in evaluating the evidence of record, the Board also should have considered and discussed the relationship of the numerous and varied psychiatric diagnoses to the veteran's service-connected disability. For example, the Board was presented with a Social Security evaluation by Dr. Zuniga that noted that the veteran's anxiety disorder was his predominant disturbance but that he was afflicted with affective disorders and personality disorders as well. R. at 32, 35. Dr. Heiman had observed "major depression in a person with mixed personality disorder". R. at 115. A VA examining physician had stated in 1988 that the veteran suffered from "psychophysiologic gastrointestinal reaction, major depression[,] and personality disorder". R. at 133.

The Court is not a factfinder and may not speculate as to the precise relationship between these disorders and the veteran's military service. *See Gilbert*, 1 Vet.App. at 53. It is the obligation of the Board to ensure that its findings are explained and that the record adequately supports its findings. *See* 38 U.S.C. § 7104(d)(1); 38 C.F.R. §§ 4.1 (1991) (accurate and fully descriptive medical examinations are required which emphasize limitation of activity imposed by disability); 4.2 (1991) (responsibility of rating specialist to reconcile various reports into consistent picture so rating reflects elements of disability present); 4.10 (basis of disability evaluations is ability to function under ordinary conditions of daily life, including employment); *see also* 38 C.F.R. § 19.182 (1991); 57 Fed.Reg. 4105 (1992) (to be codified at 38 C.F.R. § 19.9) (when, during course of review, BVA determines that further evidence, or clarification of evidence, or correction of procedural defect is essential for proper appellate decision, BVA shall remand case to RO).

In order to explain the relationship between these disorders, and pursuant to its statutory duty, under 38 U.S.C. § 5107(a) (formerly § 3007), to assist claimants who have presented well-grounded claims, the Board should have ordered (as it will be required to do upon remand unless it determines, on the basis of the current evidentiary record, that the veteran is entitled to a 100% rating), under 38 C.F.R.

§ 3.327 (1991), a thorough, fully informed, and comprehensive medical examination to (1) reconcile the diagnoses; (2) evaluate the veteran for the purpose of determining the existence of each of the impairments noted in the record; (3) determine the degree of disability, in terms of ordinary conditions of life, imposed by each impairment, if possible, and its relation to service; and (4) determine the extent to which each impairment contributes to the veteran's employability or unemployability. *See Proscelle v. Derwinski*, 2 Vet.App. 629, 632, 633 (1992); *Cousino v. Derwinski*, 1 Vet.App. 536, 540 (1991); *EF v. Derwinski*, 1 Vet.App. 324, 326 (1991); *Green v. Derwinski*, 1 Vet.App. 121, 124 (1991). The examiner must have the full medical record of the veteran prior to making the evaluation. *See* 38 C.F.R. § 4.1. Only after making such findings may the Board properly determine the appropriate disability rating for the veteran.

 The benefit-of-the-doubt doctrine of 38 U.S.C. § 5107(b) (formerly § 3007) provides that where the evidence of record is in relative equipoise with regard to a material issue, that issue will be resolved in favor of the claimant. Moreover, the "reasons or bases" requirement applies to the Board's resolution of the benefit-of-the-doubt question. *See O'Hare v. Derwinski*, 1 Vet.App. 365, 367 (1991); *Hatlestad I*, 1 Vet.App. at 170; *Gilbert*, 1 Vet. App. at 58. Here, the Board, in deciding to increase the veteran's service-connected disability rating from 30% to 50%, gave this requirement only cursory treatment, stating: "Resolving reasonable doubt in the veteran's favor, we find that the current manifestations of his psychophysiological impairment are such that a 50 percent rating is warranted". *Shoemaker*, BVA 90–17136, at 4. In light of the substantial evidence in the record that the veteran's overall impairment from all disabilities more than "considerably" impairs his social and industrial capabilities, the Board was, and is on remand, required to consider and explain whether and why, under 38 U.S.C. § 5107(b), the evidence does or does not preponderate against the veteran being entitled to a rating higher than 50%.

## B. Individual Unemployability

 Even if the 50% rating were properly and correctly assigned, the Board still was required to consider a total rating for individual unemployability under 38 C.F.R. § 4.16(b), which provides:

> It is the established policy of [VA] that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. Therefore, rating boards should submit to the Director [of the] Compensation and Pension Service[ ] for extra-schedular consideration all cases of veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in paragraph (a) of this section.

38 C.F.R. § 4.16(b) (1991). *See Proscelle*, 2 Vet.App. at 634; *Mingo v. Derwinski*, 2 Vet.App. 51, 53–54 (1992).

The evidence of record here contained numerous findings that the veteran could not work, let alone function ably outside the home. Therefore, just as the Board was required to consider whether the veteran was entitled to a 70% or 100% schedular rating, it was required also to consider whether he was unemployable under section 4.16(b). *See Brown, supra* (evidence regarding SSA's determination of unemployability is relevant to VA determination of appellant's ability to engage in substantially gainful employment). If the Board considered the applicability of this regulation but rejected it, the Board should have so stated, pursuant to the requirements of 38 U.S.C. § 7104(d)(1), and provided the reasons or bases for such rejection.

If the Board determines, on remand, that the veteran is entitled to a 70% service-connected rating, then it must consider the applicability of 38 C.F.R. § 4.16(c) (1991), which provides that in cases in which the only service-connected disability rating is a mental disorder assigned a 70% evaluation, and in which that mental disorder precludes the claimant from "securing or following a substantially gainful occupation", the mental disorder shall be assigned a

100% schedular evaluation under the appropriate diagnostic code. *See also* 38 C.F.R. § 3.340 (1991) ("[t]otal disability will be considered to exist when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation"). Regulations of the VA pertaining to the assignment of ratings of psychiatric disabilities acknowledge in 38 C.F.R. § 4.130 (1991) the importance of considering section 4.16 in the evaluation of a claimant's psychiatric disability, stating, in pertinent part:

> Ratings are to be assigned which represent the impairment of social and industrial adaptability based on all of the evidence of record. (See § 4.16 regarding the issue of individual unemployability based on mental disorder.)

## C. The 50% Rating

" 'The proper course in a case with an inadequate record is to vacate the agency's decision and to remand the matter to the agency for further proceedings.' " *Gilbert* 1 Vet.App. at 57 (quoting *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 347 (D.C.Cir.1989)); *see Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (if finding by Comptroller that new bank was uneconomic venture is not sustainable on administrative record made, finding must be vacated and the matter remanded for his further consideration). Thus, the Court typically vacates and remands a BVA decision which has provided inadequate reasons or bases to support its findings and conclusions.

However, because of the unusual circumstances presented by this case, the Court will retain jurisdiction and remand the record to the Board for readjudication. It will not vacate the Board's decision awarding the appellant a 50% disability rating, even though the Board's decision, by virtue of its numerous "reasons or bases" deficiencies, is incomplete even as to the 50% rating assigned, as well as its implicit decision not to assign a higher rating. The 50% rating will thus remain in effect unless and until it is replaced by a different rating approved by the Board in a subsequent final Board action superseding its previous action. In view of the Court's conclusion that the Board has failed to give to this case the scrutiny which the requirements of section 7104(d)(1) are designed to ensure, a decision to vacate the Board's award of the 50% rating would prejudice the appellant and would be contrary to the spirit and principal purpose of that statutory requirement that the Board provide reasons or bases for its awards and denials of benefits—assisting the appellant and facilitating judicial review.

## III. CONCLUSION

In view of the foregoing discussion and after consideration of the record and the briefs and oral arguments of the parties, the Court holds that the Board's decision is not in accordance with law because of its failure to articulate the reasons or bases for its findings and conclusions as herein discussed, to consider and, as appropriate, apply 38 C.F.R. § 4.16(b), or (c), and to parse the veteran's numerous disorders by obtaining a contemporaneous, fully informed, and thorough medical examination. Therefore, pursuant to 38 U.S.C. § 7252(b), the record is remanded for prompt readjudication in order to fulfill these obligations through a critical examination of previously existing evidence, of the results of a thorough medical examination which addresses the concerns raised herein, and of any additional evidence and arguments that the veteran wishes to submit and any further evidence that the BVA wishes to seek in an effort to resolve this claim—all in accordance with this opinion. *See Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991). After assembling all the evidence, the Board must assess it in the context of whether, under 38 U.S.C. § 5107(b), the veteran is entitled to the benefit of the doubt with respect to each material issue in connection with the assignment of the appropriate disability rating for his service-connected disability. The Court retains jurisdiction. The Secretary shall file with the Clerk (as well as serve upon the appellant) a copy of any final Board decision on remand. Within 14 days after any such

filing, the appellant shall notify the Clerk whether he desires to seek further review by the Court.

REMANDED.